Filed 3/22/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DIGNA REYES et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>BENEFICIAL STATE BANK,<br><br>    Defendant and Respondent. | F080827<br><br>(Kern Super. Ct.<br>No. BCV-17-100082)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Kern County.  David R. Lampe, Judge.

Rosner, Barry & Babbit, Hallen D. Rosner, Christopher P. Barry, and Arlyn L. Escalante for Plaintiffs and Appellants.

Steven A. Silver; Severson & Werson and Jan T. Chilton for Defendant and Respondent.

-ooOoo-

Plaintiffs Digna Reyes and Sylvester Fulton IV, purchasers of a used vehicle, appeal the trial court's denial of their motion for attorney fees against defendant Beneficial State Bank (Beneficial) following plaintiffs' acceptance of Beneficial's offer to compromise plaintiffs' lemon law claims.  Beneficial was the holder of the retail installment sale contract by which plaintiffs purchased the vehicle.  Plaintiffs argue the

trial court erred by denying their motion for attorney fees. Plaintiffs further argue this court should reject case law holding that recovery of attorney fees against a holder is capped under title 16, section 433.2 of the Federal Regulations (Holder Rule) and that a recent statute providing otherwise is preempted. We believe plaintiffs' contentions have merit. We reverse the trial court's denial of their motion for attorney fees and remand to the trial court for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

Because this matter was settled prior to trial, the facts recited in this opinion are drawn primarily from the allegations of plaintiffs' first amended complaint.

On February 24, 2016, plaintiffs purchased a used motor vehicle for personal use from Iad Hamdi Manna (Manna) doing business as Auto Cruz (Auto Cruz). A salesperson at Auto Cruz told plaintiffs that if they were not happy with the vehicle, they could return it within seven days subject to payment of a $500 restocking fee. The salesperson also told plaintiffs the vehicle came with a 30-day warranty on the engine and transmission.

To complete the purchase, plaintiffs made a down payment of $3,000 and executed a retail installment sale contract to finance the remainder of the purchase price. The contract contained a provision allowing Auto Cruz to cancel the contract if Auto Cruz was unable to assign it to one of the financial institutions with which Auto Cruz regularly does business.

Auto Cruz submitted the contract to defendant Pan American Bank (Pan American) for its approval. However, Pan American declined to accept the loan terms set forth in the contract and, instead, proposed different financing terms for the loan. As a result, on March 1, 2016, Manna informed plaintiffs they would need to return to the dealership to sign a new contract.

By this time, plaintiffs had been experiencing mechanical problems with the vehicle and no longer wanted it. On March 2, 2016, they returned the vehicle to Auto

2.

Cruz, requested return of their down payment, and offered to pay Auto Cruz the $500 restocking fee.

Manna spoke with plaintiffs and convinced them that the vehicle was otherwise in good condition and that his mechanic could fix the problems they had been experiencing. Based on those representations, plaintiffs signed a new retail installment sale contract (Contract), and Auto Cruz applied their down payment to the Contract.

On March 7, 2016, plaintiffs took the vehicle to Auto Cruz for the necessary repairs. On March 9, 2016, a representative of Auto Cruz called plaintiffs to let them know the vehicle was ready to be picked up. However, the vehicle continued to malfunction. Two days later, plaintiffs called Manna to advise the vehicle was still not performing properly. They told Manna they wanted to cancel the Contract, but Manna refused.

Unsatisfied, plaintiffs took the vehicle to another dealership to have it diagnosed. The second dealership informed plaintiffs the vehicle had serious mechanical defects that impaired its use, value, and safety. Among other things, one of the vehicle's engine mounts was held up only by a chain and the transmission needed to be replaced. Plaintiffs returned to Auto Cruz with the results of the second dealership's diagnosis of the vehicle, but Auto Cruz again refused to accept return of the vehicle.

On January 11, 2017, plaintiffs filed suit against defendants Manna doing business as Auto Cruz, Pan American, and Philadelphia Indemnity Insurance Company (Philadelphia Indemnity).[1] Plaintiffs filed a first amended complaint which set forth new

---

[1] Philadelphia Indemnity had issued a $50,000 bond to Auto Cruz pursuant to Vehicle Code section 11710 which provides, in part: "Before any dealer's or remanufacturer's license is issued or renewed by the department to any applicant therefor, the applicant shall procure and file with the department a bond executed by an admitted surety insurer, approved as to form by the Attorney General, and conditioned that the applicant shall not practice any fraud or make any fraudulent representation which will cause a monetary loss to a purchaser, seller, financing agency, or governmental agency." (Veh. Code, § 11710, subd. (a).)

allegations but retained the same causes of action as the original complaint. Among the new allegations was that Pan American had merged with its successor in interest, Beneficial. Beneficial answered the first amended complaint as Pan American's successor in interest.

Plaintiffs' first amended complaint alleged causes of action against Manna and Beneficial for (1) violation of the Consumers Legal Remedies Act (CLRA) (Civ. Code § 1750, et seq.);[2] (2) fraud; (3) negligent misrepresentation; (4) violation of the Song-Beverly Consumer Warranty Act (Song-Beverly) (§ 1790 et seq.); (5) violation of Business & Professions Code section 17200, et seq; and (6) violation of Vehicle Code section 11713. The first amended complaint alleged a single cause of action against Philadelphia Indemnity for violation of Vehicle Code section 11711.

Each of plaintiffs' claims against Beneficial were premised on the Holder Rule provision contained in the Contract. Per a regulation of the Federal Trade Commission (FTC), the Holder Rule provision must be included in consumer credit contracts. The provision reads:

> "NOTICE [¶] ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER." (16 C.F.R. § 433.2, subd. (a).)

In addition, the Contract contained an attorney fee provision which reads: "You may have to pay collection costs. You will pay our reasonable costs to collect what you owe, including attorney fees, court costs, collection agency fees and fees paid for other reasonable collection efforts.…"

---

[2] All further statutory references are to the Civil Code unless otherwise noted.

Plaintiffs eventually dismissed Manna from the lawsuit after he purportedly filed for bankruptcy protection. Plaintiffs also dismissed Philadelphia Indemnity from the lawsuit after they arrived at a settlement on the bond claim.

On or about January 24, 2019, Beneficial served plaintiffs with an offer to compromise pursuant to Code of Civil Procedure section 998 which plaintiffs timely accepted. On July 18, 2019, the trial court entered judgment pursuant to the offer. Relevant to this appeal, the offer to compromise, and the resulting judgment, each provided:

> "5. Beneficial [ ] will reimburse [p]laintiffs' costs, other than attorney[] fees pursuant to Code of Civil Procedure § 1032(b) in the amount determined by the Court according to law and proof.

> "6. Beneficial [] will reimburse [p]laintiffs' reasonable attorney[] fees, if any, in the amount determined by the Court according to law and proof."

On October 4, 2019, plaintiffs filed a motion for attorney fees, costs, and expenses seeking $53,134.50 in attorney fees and $6,629.41 in costs and expenses for a total award of $59,763.91.

On November 25, 2019, the trial court granted plaintiffs' request for costs and denied their request for attorney fees.

An order conforming to the trial court's ruling was issued on December 5, 2019. On December 13, 2019, Beneficial served plaintiffs with notice of entry of the order. On February 11, 2019, plaintiffs timely appealed.

## DISCUSSION

Plaintiffs contend that the trial court erred by denying their motion for attorney fees, that they are entitled to an award of reasonable attorney fees under sections 1459.5, 1717 and 2983.4, and that this court should reject the reasoning of two recent appellate decisions, *Lafferty v. Wells Fargo Bank, N.A.* (2018) 25 Cal.App.5th 398 (*Lafferty*) and *Spikener v. Ally Financial, Inc.* (2020) 50 Cal.App.5th 151 (*Spikener*) which, if followed,

5.

would defeat their fee claim. In 2021, a third appellate decision, *Pulliam v. HNL Automotive Inc.* (2021) 60 Cal.App.5th 396 (*Pulliam*), review granted April 28, 2021, S267576,[3] issued and held contrary to the holdings in *Lafferty* and *Spikener*. Plaintiffs argue we should follow *Pulliam*. Before this appeal was heard, a fourth appellate decision, *Melendez v. Westlake Services, LLC* (2022) 74 Cal.App.5th 586 (*Melendez*), issued and found *Pulliam* to be the better reasoned decision. (*Melendez*, *supra*, 74 Cal.App.5th at p. 589.)

Upon review, we agree with the result of *Pulliam* although our reasoning differs from that case in certain respects. We conclude plaintiffs are entitled to an award of attorney fees, reverse the trial court's order denying the same, and remand the case to the court for further proceedings consistent with this opinion.

## I.    Standard of Review

At issue is the proper interpretation of the Holder Rule provision and several California statutes which authorize the recovery of attorney fees in various situations. " '[I]ssues of statutory construction and contract interpretation that do not turn on extrinsic evidence are subject to independent review.' " (*Lafferty*, *supra*, 25 Cal.App.5th at p. 409.) Although attorney fee awards are typically reviewed for abuse of discretion, " ' "a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo." [W]here the material facts are largely not in dispute, our review is de novo.'" (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 406.) Moreover, " ' "a disposition that rests on an error of law constitutes an abuse of discretion." ' " (*Id.* at p. 401.)

Here, the material facts are largely undisputed and none of the interpretive issues presented turn on extrinsic evidence. Accordingly, our review on appeal is de novo.

---

[3] A case pending review in the California Supreme Court has "no binding or precedential effect, and may be cited for potentially persuasive value only." (Cal. Rules of Court, rule 8.1115(e)(1).)

## II. The Holder Rule

The FTC "promulgated the Holder Rule in 1975 as a consumer protection measure to abrogate the holder in due course rule for consumer installment sale contracts that are funded by a commercial lender.  [Citations.]  'Under the holder in due course principle, the creditor could "assert his right to be paid by the consumer despite misrepresentation, breach of warranty or contract, or even fraud on the part of the seller, and despite the fact that the consumer's debt was generated by the sale." ' " (*Lafferty*, *supra*, 25 Cal.App.5th at pp. 410–411.)

A seller could confer holder in due course status upon a commercial lender, for example, by having a consumer/buyer sign a promissory note for the outstanding purchase price amount during the initial stages of a transaction and then assigning the promissory note to a third party lender willing to finance the purchase.  (Preservation of Consumers' Claims and Defenses, 40 Fed.Reg. 53506, 53507 (Nov 18. 1975).)  As explained by the FTC:

> "The use of a promissory note entails the execution and subsequent assignment of what commercial law calls a 'negotiable instrument.'  Under Article Three of the Uniform Commercial Code, pre-existing equities are foreclosed when a negotiable instrument is purchased by a third party in good faith and without notice of claims, defenses, or infirmities arising from the transaction between the makers.  When a third party purchases a consumer's promissory note, he will receive the note as a 'holder in due course' free and clear of any claim or grievance that the consumer may have with respect to the seller." (*Id*. at p. 53507.)

Other mechanisms were sometimes employed to accomplish the same goal of separating the consumer's obligation to pay from the seller's obligation to perform. (40 Fed.Reg., *supra*, at pp. 53507–53508.)  For example, a seller could include a waiver of defenses clause in its retail installment sales contract and then assign that contract to a third party lender.  (*Id*. at p. 53507.)  The FTC explained:

> "An assignee of a retail sale contract, as distinguished from a note because of the inclusion of mutual promises and obligations, may, under UCC 9-

7.

206, assert rights analogous to those of a holder in due course if the contract contains an 'agreement not to assert defenses against an assignee....' If the same tests of good faith and lack of notice are met, the creditor who buys the contract is in the same position as a holder in due course." (*Id*. at p. 53508, fn. omitted.)

The FTC considered it "an unfair practice for a seller to employ procedures in the course of arranging the financing of a consumer sale which separate the buyer's duty to pay for goods or services from the seller's reciprocal duty to perform as promised." (40 Fed.Reg., *supra*, at p. 53522.) The effect of the practice was to leave consumers with limited recourse in the event a seller failed to perform his or her end of the bargain. (Guidelines on Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, 41 Fed.Reg. 20022 (May 14, 1976.) In those instances, the consumer would be obligated to continue to pay the lender despite not having received the consideration he or she was due from the seller. (*Ibid*.) Thus, the consumer no longer had the leverage it otherwise would have had to secure the seller's performance – the withholding of payment. (*Ibid*.; *Music Acceptance Corp. v. Lofing* (1995) 32 Cal.App.4th 610, 628.)

With the adoption of the Holder Rule, a consumer now has recourse against both the seller and commercial lender in transactions involving retail installment sale contracts. (*Music Acceptance Corp. v. Lofing*, *supra*, 32 Cal.App.4th at p. 628.) However, the second sentence of the Holder Rule provision places a limitation on the recourse that may be obtained against a commercial lender. (16 C.F.R. § 433.2, subd. (a).) The scope of that limitation is at issue here.

In 2015, the FTC "request[ed] public comment on the overall costs and benefits, and regulatory and economic impact" of the Holder Rule "as part of the agency's regular review of all its regulations and guides." (Rules and Regulations Under the Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, 80 Fed.Reg. 75018 (Dec. 1, 2015).) The FTC conducts such periodic reviews to determine whether its rules and guides "warrant modification or rescission." (*Id*. at p. 75019.) As

8.

part of its review, the FTC solicited comment on 15 specific questions (plus subparts). None of the questions posed directly concerned whether a successful consumer litigant was, or should be, limited in the amount of attorney fees it could be awarded under the Holder Rule. (*Ibid.*)

In 2019, the FTC completed its review and "determined to retain the [Holder] Rule without modification" (2019 Rule Confirmation). (Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, 84 Fed.Reg. 18711 (May 2, 2019).) Although the FTC's 2015 request for public comment did not expressly solicit comments related to the recovery of attorney fees under the Holder Rule, the FTC received six comments related thereto. In response, the FTC wrote, "We conclude that if a federal or state law separately provides for recovery of attorney[] fees independent of claims or defenses arising from the seller's misconduct, nothing in the [Holder] Rule limits such recovery. Conversely, if the holder's liability for fees is based on claims against the seller that are preserved by the Holder Rule [provision], the payment that the consumer may recover from the holder – including any recovery based on attorney[] fees – cannot exceed the amount the consumer paid under the contract." (84 Fed.Reg., *supra*, at p. 18713.)

## III. Relevant Case Law, Legislation, and FTC Publications

We have the benefit of four recent, published decisions involving the interpretation of the Holder Rule provision, *Lafferty*, *Spikener*, *Pulliam*, and *Melendez*. We discuss those cases below.

### A. *Lafferty*

In *Lafferty*, the Third District Court of Appeal concluded "a consumer cannot recover more *under the Holder Rule cause of action* than what has been paid on the debt regardless of what kind of a component of the recovery it might be – whether compensatory damages, punitive damages, *or attorney fees*." (*Lafferty*, *supra*, 25 Cal.App.5th at p. 414, second italics added.) It arrived at this conclusion by examining

the "three main parts" of the second sentence of the Holder Rule provision – i.e., "recovery," "shall not exceed amounts paid by the debtor," and "hereunder." (*Lafferty*, at p. 412, capitalization omitted.)

The *Lafferty* court consulted Black's Law Dictionary which defined " 'recovery' " to mean: " 'An amount awarded in or collected from a judgment or decree.' " (*Lafferty*, *supra*, 25 Cal.App.5th at p. 412.) Citing, as examples, various judicial opinions that have used the term, the court noted the term is "broad and regularly used to include compensatory damages, punitive damages, attorney fees, and costs[;]" courts have used it "to include attorney fees and interest awarded as part of a judgment[;]" and one court has used the term to " 'include the entire remedy effectuated … encompass[ing] the total benefit conferred upon [a party] through the efforts of counsel.' " (*Ibid*.)

In examining the language " 'shall not exceed amounts paid by the debtor,' " *Lafferty* noted the FTC's description of the "limitation on consumer recovery from a creditor as follows: 'From the consumer's standpoint, this means that a consumer can … maintain an affirmative action against a creditor who has received payments *for a return of monies paid on account*.' " (*Lafferty*, *supra*, 25 Cal.App.5th at pp. 412–413, quoting 40 Fed.Reg., *supra*, at p. 53524, italics added in original.) The court further noted that the year after promulgation of the Holder Rule, the FTC explained the limitation on such recovery, as follows: " 'This limits the consumer to a refund of monies paid under the contract, in the event that an affirmative money recovery is sought. [T]he consumer will not be entitled to receive from the creditor an affirmative recovery which exceeds the amounts of money the consumer has paid in.' [Citation.]" (*Id*. at p. 413, citing 41 Fed.Reg., *supra*, at p. 20023.)

As for the term "hereunder," the *Lafferty* court stated, "By using the word 'hereunder' to modify the amount and type of recovery a consumer can assert under the Holder Rule, the FTC indicated the Holder Rule constraint does not apply to independent causes of action accruing under state and local law." (*Lafferty*, *supra*, 25 Cal.App.5th at

p. 413.)  In support of this statement, the court cited the FTC guidelines which state, " 'The limitation on affirmative recovery does not eliminate any other rights the consumer may have as a matter of local, state, or federal statute.  The words "recovery hereunder" which appear in the text of the Notice refer specifically to a recovery under the Notice.  If a larger affirmative recovery is available against a creditor as a matter of state law, the consumer would retain this right.' " (*Ibid*., quoting 41 Fed.Reg., *supra*, at p. 20023.)

Although *Lafferty* held a consumer's recovery of attorney fees is capped by the Holder Rule provision, it held the consumer's recovery of costs under subdivision (b) of Code of Civil Procedure section 1032 – which provides '[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs *in any action* or proceeding' " – is not limited by the provision.  (*Lafferty*, *supra*, 25 Cal.App.5th at pp. 414–415, italics added in original.)  In support of the different treatment afforded these two types of recovery, the court drew a distinction between recovery on a "cause of action" which it said, " 'refers to the obligation itself' " and recovery on an "action" which it said, " 'refers to the entire judicial proceeding at least through judgment .…' " (*Id*. at p. 414–415.)  Under the reasoning of *Lafferty*, the Holder Rule provision caps recovery on a Holder Rule "cause of action" but does not limit recovery of costs which are awarded to a prevailing party " '*in any action* or proceeding.' " (*Lafferty*, at pp. 414–415, italics added in original.)

## B.  *Legislative Response to Lafferty*

In 2019, in direct response to the *Lafferty* decision, the California Legislature enacted Assembly Bill No. 1821 codified at section 1459.5.  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1821 (2019–2020 Reg. Sess.) June 12, 2019, pp. 3–5 (Senate Floor Analysis).)  Section 1459.5 provides:

> "A plaintiff who prevails on a cause of action against a defendant named pursuant to Part 433 of Title 16 of the Code of Federal Regulations

11.

or any successor thereto, or pursuant to the contractual language required by that part or any successor thereto, may claim attorney[] fees, costs, and expenses from that defendant to the fullest extent permissible if the plaintiff had prevailed on that cause of action against the seller."

Section 1459.5 was intended to counter the holding in *Lafferty* and enable a prevailing consumer the ability to recover attorney fees (in addition to costs and expenses) from a nonprevailing holder of a retail installment contract even if such a recovery would cause the total amount awarded to exceed the amount the consumer paid to the lender. (Senate Floor Analysis, *supra*, at pp. 3–5.)

## C.    *Spikener*

In 2020, the First District Court of Appeal also considered whether the Holder Rule provision capped recovery of attorney fees. (*Spikener*, *supra*, 50 Cal.App.5th at pp. 154–155.) The *Spikener* court relied primarily upon the FTC's interpretation of the provision in its 2019 Rule Confirmation which reads: "We conclude that if a federal or state law separately provides for recovery of attorney[] fees independent of claims or defenses arising from the seller's misconduct, nothing in the [Holder] Rule limits such recovery. Conversely, if the holder's liability for fees is based on claims against the seller that are preserved by the Holder Rule Notice, the payment that the consumer may recover from the holder – including any recovery based on attorney[] fees – cannot exceed the amount the consumer paid under the contract." (84 Fed.Reg., *supra*, at p. 18713.) *Spikener* concluded the 2019 Rule Confirmation was entitled to deference and dispositive. (*Spikener*, *supra*, 50 Cal.App.5th at pp. 158–159.)

Having determined the FTC's 2019 Rule Confirmation was controlling, the *Spikener* court further held section 1459.5 conflicts with the Holder Rule and is preempted. (*Spikener*, *supra*, 50 Cal.App.5th at p. 160.) *Spikener* concluded the FTC's construction of the Holder Rule provision's limitation on recovery of attorney fees in the 2019 Rule Confirmation "demonstrates a clear intent to prohibit states from authorizing a recovery that exceeds this amount on a Holder Rule [provision] claim." (*Spikener*, at

p. 162.) *Spikener* explained, "the [2019] Rule Confirmation expressly preserves a state's ability to authorize attorney fees against holders *independent of Holder Rule claims*, and clarifies that such fee claims are not constrained by the Holder Rule's limitation on recovery." (*Ibid*.)

### D. *Pulliam*

In *Pulliam*, Division Five of the Second District Court of Appeal was called upon to interpret the Holder Rule provision and to determine whether an award of attorney fees is capped by the provision's limitation on recovery. The *Pulliam* court noted a lack of uniformity among other state and federal courts in interpreting the Holder Rule provision with some jurisdictions capping the amount of attorney fees that may be awarded under the provision, and others not limiting such recovery. (*Pulliam*, *supra*, 60 Cal.App.5th at pp. 410–411.)

*Pulliam* disagreed with *Lafferty*'s interpretation of the word "recovery" as used in the Holder Rule. As noted, *Lafferty* determined the term included compensatory damages, punitive damages, and attorney fees. See *Lafferty*, *supra*, 25 Cal.App.5th at p. 414. *Pulliam* consulted Black's Law Dictionary and noted the following definitions " '1. The regaining or restoration of something lost or taken away. [¶] … [¶] 2. The obtainment of a right to something (esp. damages) by a judgment or decree…. 4. An amount awarded in or collected from a judgment or decree.' " (*Pulliam*, *supra*, 60 Cal.App.5th at p. 413, citing " 'recovery' " definition, Black's Law Dict. (11th ed. 2019) p. 1528.) *Pulliam* concluded the definition "focuses on damages, i.e.[,] restoring money that was taken away from the plaintiff, and does not expressly address attorney fees." (*Pulliam*, at p. 413.)

The *Pulliam* court also disagreed with *Spikener* and concluded that the 2019 Rule Confirmation was not entitled to dispositive deference. (*Pulliam*, *supra*, 60 Cal.App.5th at pp. 419–422.) To afford deference to an agency's interpretation of its own ambiguous regulations, *Pulliam* noted, four factors must be considered:

13.

"First, the 'regulatory interpretation must be one actually made by the agency. In other words, it must be the agency's "authoritative" or "official position," rather than any more [*sic*] ad hoc statement not reflecting the agency's views. [Citation.]' [Citation.] 'Next, the agency's interpretation must in some way implicate its substantive expertise.' [Citation.] 'Finally, an agency's reading of a rule must reflect "fair and considered judgment" to receive … deference. [Citation.]' [Citation.] A court should decline to defer to a convenient litigation position or post hoc rationalization. [Citation.] Moreover, a court may not 'defer to a new interpretation, whether or not introduced in litigation, that creates "unfair surprise" to regulated parties. [Citation.] That disruption of expectations may occur when an agency substitutes one view of a rule for another.' [Citation.] Such an upending of reliance may occur without an explicit interpretive change; we will not defer to an interpretation that would impose retroactive liability on parties for long-standing conduct the agency never before addressed." (*Pulliam*, *supra*, 60 Cal. App. 5th at pp. 419–420, citing *Kisor v. Wilkie* (2019) ___ U.S. ___, ___ [139 S.Ct. 2400, 2416–2418, 204 L.Ed2d 841].)

For purposes of its analysis, *Pulliam* assumed that the first factor was met – i.e., the FTC's interpretation of the Holder Rule was " 'actually made by the agency.' " (*Pulliam*, *supra*, 60 Cal.App.5th at p. 420.) However, *Pulliam* did not agree the interpretation involved the "FTC's substantive expertise" because "(1) Resolution of the issue may turn on the particular state statute providing for attorney fee recovery at issue, and whether that statute is intended to be punitive against the payor or simply to make the payee whole. (2) As illustrated by the FTC's request for comments which led to the [2019 Rule Confirmation], the FTC sought to exercise its judgment based on data regarding the effect of the rule (or any proposed rule change) on consumers and businesses. No commenter provided the FTC with data on the costs and benefits to consumers or businesses in different jurisdictions based on the availability of attorney fees or any limitations placed on them." (*Ibid*.) *Pulliam* concluded "the FTC's statement regarding attorney fees in its rule confirmation was not an exercise of its substantive expertise, but simply a position taken after limited arguments were made on each side." (*Ibid*., fn. omitted.)

14.

*Pulliam* also rejected the notion that the 2019 Rule Confirmation "truly represented the ' "fair and considered judgment" [necessary] to receive … deference' " based on the fact the FTC never solicited comments on the issue of attorney fees under the Holder Rule as part of its rule confirmation process and only six comments on the issue were supplied to the FTC. (*Pulliam*, *supra*, 60 Cal.App.5th at p. 420.)

Finally, *Pulliam* considered whether the 2019 Rule Confirmation disrupted the expectations of regulated parties by issuing a new interpretation. (*Pulliam*, *supra*, 60 Cal.App.5th at pp. 419–420.) The court wrote: "[A]lthough we cannot say the position taken in the [2019 Rule Confirmation] was a change in interpretation – as the FTC had not previously interpreted the rule at all – it did, in fact, address an issue never previously addressed, and undermined the existing practice in those jurisdictions in which attorney fees in excess of the cap had been, and were being, imposed as a matter of course." (*Id*. at p. 420.)

*Pulliam* concluded the Holder Rule provision did not limit the recovery of attorney fees. (*Pulliam*, *supra*, 60 Cal.App.5th at p. 422.) As a result, it determined that section 1459.5 was consistent with the Holder Rule and that it was unnecessary to "address whether section 1459.5 independently applie[d]." (*Pulliam*, at p. 422.)

### E. *2022 FTC Advisory Opinion*

On January 18, 2022, the FTC issued an advisory opinion on the "Holder Rule, and its impact on consumers' ability to recover costs and attorneys' fees." (FTC, Commission Statement on the Holder Rule and Attorneys' Fees and Costs (Jan. 18, 2022), p. 1, at <https://www.ftc.gov/policy/advisory-opinions>, archived at https://perma.cc/54G3-2F5Q (FTC Advisory Opinion).) The FTC Advisory Opinion noted that certain courts have "misinterpret[ed] the Holder Rule as a limitation on the application of state cost-shifting laws to holders"[4] whereas others have "conclude[ed]

---

[4] FTC Advisory opinion, page 1, footnote 2, citing, without limitation: *Spikener*, *supra*, 50 Cal.App.5th at p. 152 [for its conclusion that "statements by the Commission

15.

correctly that the Holder Rule does not limit recovery of attorney[] fees and costs when state law authorizes awards against a holder."[5] (*Ibid*.)

The FTC Advisory Opinion goes on to state in its analysis, "The Holder Rule does not eliminate any rights the consumer may have as a matter of separate state, local, or federal law. Consequently, whether costs and attorney[] fees may be awarded against the holder of the credit contract is determined by the relevant law governing costs and fees. Nothing in the Holder Rule states that application of such law to holders is inconsistent with Section 5 of the FTC Act or that holders should be wholly or partially exempt from these laws." (FTC Advisory Opinion, p. 2.) The FTC Advisory Opinion further states that where "the applicable law requires or allows costs or attorney[] fee awards against a holder, the Holder Rule does not impose a cap on such an award." (*Id*. at p. 3.)

### F. *Melendez*

In *Melendez*, Division Eight of the Court of Appeal, Second Appellate District considered whether the Holder Rule provision capped attorney fees on facts similar to those here. The plaintiff in *Melendez*, a purchaser of a used vehicle under a retail installment contract, sued the dealer and the defendant creditor/holder of the contract, for alleged violations of Song-Beverly, the CLRA, Business & Professions Code sections 17200, section 1632 (requiring contracts negotiated in a foreign language be translated) and for fraud and negligent misrepresentation. (*Melendez*, *supra*, 74 Cal.App.5th at

---

[in its 2019 Rule Confirmation] demonstrate 'clear intent' to preempt attorney fee recovery 'regardless of whether state claim being asserted pursuant to the Holder Rule contains fee-shifting provisions', but declining to express opinion whether costs are preempted for the same reason"]; and *Lafferty*, *supra*, 25 Cal.App.5th at pp. 414–416 [for its conclusion that the "second sentence of the Holder Rule Notice caps attorneys' fees claim against defendant-holder unless 'another state or local cause of action can be found to support such a claim,' but that costs are not subject to the same cap"].)

[5] FTC Advisory opinion, page 1, footnote 1, citing, without limitation *Pulliam*, *supra*, 60 Cal.App.5th 396 [for its conclusion that the Holder Rule does not limit attorney fee recovery from holder; rejecting contrary position attributed to FTC and ruling that such an agency interpretation would not be entitled to deference].)

p. 589.)  The plaintiff and the defendant creditor/holder settled their dispute and agreed that plaintiff could move for recovery of "attorney fees, costs, expenses, and prejudgment interest" but preserved the defendant/creditor's ability to dispute the plaintiff's entitlement thereto " 'including the defense that no fees at all should be awarded against [the defendant creditor/holder] as a Holder as that term is defined at law.' " (*Ibid*.)  The trial court granted the motion, awarded the plaintiff the relief he requested, and defendant appealed.  (*Id*. at p. 590.)

*Melendez* recounted much of the case law and FTC publication history set forth in this opinion.  (*Melendez*, *supra*, 74 Cal.App.5th at pp. 590–592.)  It agreed with *Pulliam* that the Holder Rule "limitation on recovery does not preclude recovery of attorney fees, and the FTC's contrary interpretation [in the 2019 Rule Confirmation] is not entitled to deference."[6]  (*Melendez*, at p. 595, fn. omitted.)  As a result, it concluded it need not consider the defendant creditor/holder's argument that section 1459.5 is preempted by the Holder Rule since that code section is consistent with its interpretation of the Holder Rule.  (*Melendez*, *supra*, 74 Cal.App.5th at pp. 592, 595.)

## IV.    Attorney Fee Awards Against a Holder Are Not Capped If a Separate State Law So Provides

### A.    *Attorney Fees are Included Within the Term "Recovery"*

" 'Quasi-legislative regulations are construed using the same principles as for the interpretation of statutes.  [Citation.]  For regulations and statutes, our guiding principle " 'is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law.' " (*Lafferty*, *supra*, 25 Cal.App.5th at p. 410.)  Courts " ' "must look first to the words of the statute [or regulation], 'because they generally provide the most reliable indicator of legislative [or regulatory] intent.' [Citation.]" ' " (*Ibid*.)  " ' "[W]ords are to be given

---

**6** *Melendez* also held the Holder Rule "limitation does not preclude recovery of costs, nonstatutory costs, or prejudgment interest." (*Melendez*, *supra*, 74 Cal.App.5th at p. 589.)

their plain and commonsense meaning.  [Citation.]  … Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation may the court turn to extrinsic aids to assist in interpretation." ' " (*Ibid*.)

We agree with *Lafferty* that the plain meaning of the word "recovery," as used in the Holder Rule, includes attorney fees.  " 'When a term goes undefined in a statute, we give the term its ordinary meaning.' " (*De Vries v. Regents of University of California* (2016) 6 Cal.App.5th 574, 590–591.)  "In divining a term's 'ordinary meaning,' courts regularly turn to general and legal dictionaries." (*Id*. at p. 591.)

As *Lafferty* notes, Black's Law Dictionary defines " 'recovery' to mean 'An amount awarded in or collected from a judgment or decree.' [Citation.]" (*Lafferty*, *supra*, 25 Cal.App.5th at p. 412.)  Merriam-Webster's online dictionary includes the following legal definition of recovery:  "2[.]a:  the obtaining, getting back, or vindication of a right or property by judgment or decree [¶] especially:  the obtaining of damages [¶] b: an amount awarded by or collected as a result of a judgment or decree[.]" (www.merriam-webster.com/dictionary/recovery.)  The online Cambridge Dictionary includes the following definition:  "Law [¶] the process of getting money from a person or company that has caused you loss or damage by order of a court of law:" (https://dictionary.cambridge.org/dictionary/english/recovery.)

Because the Holder Rule provision contemplates legal action, the foregoing definitions are particularly appropriate for use in construing the term "recovery."

Moreover, the definitions found in general (as opposed to legal) dictionaries for the term "recovery" are either consistent with or, at a minimum, not inconsistent with a construction that includes attorney fees within the scope of the term.  For example, Merriam-Webster's online thesaurus defines the term "recovery" as "the act or process of getting something back …" and provides several examples of synonyms, namely: "recapture, reclamation, recoupment, repossession, retrieval." (www.merriam-webster.com/thesaurus/recovery.)  The relevant entry for the word

18.

"recovery" in the online Cambridge Dictionary is "the process of getting something back[.]" (https://dictionary.cambridge.org/dictionary/english/recovery.)

Undoubtedly, the recovery of attorney fees restores a claimant to his previous state or condition and, absent recovery, attorney fees are lost to the claimant. Consequently, we conclude the term "recovery," as used in the Holder Rule provision, is sufficiently broad to include attorney fees.

Our conclusion is also consistent with the FTC's interpretation of the Holder Rule in both the FTC Advisory Opinion and the 2019 Rule Confirmation (as clarified in the FTC Advisory Opinion). In its FTC Advisory Opinion, the FTC makes clear that recovery of attorney fees against a holder in excess of amounts paid on the contract is contingent upon the existence of a separate federal or state law providing for such a recovery – otherwise recovery of such fees is limited by the Holder Rule provision. (See FTC Advisory Opinion, p. 3 [noting that if an applicable federal or state law "permits assessing costs or attorneys' fees exclusively against the seller" then "[t]he holder's obligation to pay costs or fee awards … would be limited to the amount paid by the consumer."]; see also *id.*, at pp. 3–4 [clarifying that "the 2019 Rule Confirmation says that nothing in the Holder Rule limits recovery of attorney fees *if* a federal or state law separately provides for recovery of attorneys' fees independent of claims or defenses arising from the seller's misconduct," italics added].)

**B.** ***Section 1459.5 Is Not Preempted and Plaintiffs Are Entitled to Its Benefit***

As discussed above, *Pulliam* concluded the 2019 Rule Confirmation was not entitled to deference on the issue of attorney fee recovery. (*Pulliam*, *supra*, 60 Cal.App.5th at p. 421–422.). We agree with *Pulliam*'s deference analysis. Moreover, as we now know, the FTC contends that courts applying the deference doctrine to the 2019 Rule Confirmation to arrive at the conclusion that section 1459.5 is preempted have misconstrued the 2019 Rule Confirmation. (FTC Advisory Opinion, p. 1.) The FTC has

expressly stated its disagreement with those cases. (*Id.*, at p. 1, fn. 1 & 2.) As a result, we conclude section 1459.5 is not preempted.[7]

But for the enactment of section 1459.5, we would likely view the Holder Rule provision as limiting a prevailing party's ability to recoup attorney fees from a holder in excess of amounts paid pursuant to a retail installment contract. With the passage of section 1459.5, however, such a prevailing party may now obtain an award of attorney fees even if it exceeds the amount he or she has paid under the contract. We conclude there is no conflict between section 1459.5 and the Holder Rule provision.[8]

Here, the trial court, having followed *Lafferty* in ruling on plaintiff's motion for attorney fees, indicated it was "unwilling to apply" section 1459.5 because it had not yet taken effect and was preempted by the [2019] Rule Confirmation – thereby applying a similar rationale as *Spikener* which had not yet been decided. We conclude, however,

---

[7] While the FTC Advisory Opinion presents itself as consistent with the 2019 Rule Confirmation, we do not read the two as completely harmonious. However, despite their friction points, the 2019 Rule Confirmation, the FTC Advisory Opinion and the Holder Rule are consistent on at least this point: the FTC did not intend for the Holder Rule to preempt all state statutes and rules of contract in unyielding pursuit of its policy objective. Instead, the Holder Rule means no more and no less than what it says: consumer contracts must include a particular provision.

The FTC presumably could have promulgated the Holder Rule as a direct, substantive rule of law, rather than as a mandatory provision in contracts. But it did not. And because the Holder Rule manifests solely as contract language, it is inherently subject to all the ways in which litigation outcomes might differ from what is expressly contemplated by a contract. One such example is when a state statute overrides a contractual provision. Here, section 1459.5 does just that. While we assume the Holder Rule could have been formulated in a fashion that would preempt statutes like section 1459.5, we remain unconvinced it has that effect here.

[8] Of course, abrogation of a rule or principle that limits attorney fee recoveries may result in exploitive action and lead to awards that are substantially larger than the actual damages suffered by a claimant. It is up to our courts to assure the just evaluation of such awards.

20.

there is no bar to application of section 1459.5 to the matter before us even though it had not taken effect when the trial court initially ruled on plaintiffs' fee motion.[9]

Absent a legislative directive to the contrary, California courts generally apply newly enacted cost and fee statutes to cases pending at the time of enactment. (*USS-Posco Industries v. Case* (2016) 244 Cal.App.4th 197, 220–222.) This is true even though the costs or fees at issue were incurred prior to the effective date of the new statute. (*Id*. at p. 201; *Stockton Theatres, Inc. v. Palermo* (1956) 47 Cal.2d 469, 477.) It is also true where a trial court has denied a fee motion and the issue is pending appeal. (*Woodland Hills Residents Association., Inc. v. City Council of Los Angeles* (1979) 23 Cal.3d 917, 925–926, 929.) "Under California Supreme Court precedent, statutory provisions that alter the recovery of attorney fees are deemed procedural in nature and apply to pending litigation." (*USS-Posco Industries v. Case*, at p. 201.)

Because section 1459.5 is currently in effect, plaintiffs are entitled to its benefit.

## V.     Section 1717

Plaintiffs contend their lawsuit was an "action on a contract" as that phrase is used in section 1717 and that, as prevailing parties, they are entitled to an award of attorney fees under the statute. Seemingly, plaintiffs broadly argue that *any* action premised on the Holder Rule provision is an "action on a contract" by virtue of the fact the provision is contained in the Contract. Beneficial contends plaintiffs' first amended complaint sets forth only tort and statutory claims, does not allege breach of contract, and therefore is not an "action on a contract." We conclude certain causes of action asserted by plaintiffs fall within the scope of section 1717 whereas others do not.

---

[9] Section 1459.5 was enacted during the California Legislature's 2019–2020 regular session and signed into law on July 12, 2019. (Legis. Counsel's Dig., Assem. Bill No. 1821 (2019–2020 Reg. Sess.).) Subject to exceptions not relevant here, a statute enacted during a regular session "shall go into effect on January 1 next following a 90-day period from the date of enactment …." (Cal. Const., art. IV, § 8, subd. (c), par. 1; Gov. Code, § 9600.)

Section 1717 provides, in relevant part:

"(a) In any action on a contract, where the contract specifically provides that attorney[] fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney[] fees in addition to other costs.

"Where a contract provides for attorney[] fees, as set forth above, that provision shall be construed as applying to the entire contract, unless each party was represented by counsel in the negotiation and execution of the contract, and the fact of that representation is specified in the contract." (§ 1717, subd. (a).)

Auto Cruz assigned the Contract to Beneficial. As a result, Beneficial succeeded to the rights of Auto Cruz under the Contract including the right to enforce the Contract and its attorney fee provision. (*Johnson v. County of Fresno* (2003) 111 Cal.App.4th 1087, 1096 ["assignment carries with it all the rights of the assignor"]; see U. Comm. Code, § 3203, subd. (d) [same for assignments of negotiable instruments]; *Finalco, Inc. v. Roosevelt* (1991) 235 Cal.App.3d 1301, 1306–1308 [assignee of promissory note entitled to benefit of its attorney fee provision].)

Here, the attorney fee provision was one-sided – conferring upon the seller (Manna/Auto Cruz) or its assignee (Beneficial), the right to seek an award of attorney fees incurred through successful efforts "to collect what [plaintiffs] owe …" under the Contract. Section 1717, subdivision (a) makes the remedy mutual as to plaintiffs. Moreover, because there is no evidence, nor any notation, in the Contract that plaintiffs were represented by counsel in negotiating the Contract, the "provision shall be construed as applying to the entire contract." (*Ibid*.) Thus, the provision is not limited to fees incurred in collection efforts. (See *Harbor View Hills Community Association v. Torley* (1992) 5 Cal.App.4th 343, 348–349 [although prior case law held a provision "may limit an award of attorney fees to certain actions or specific provisions of the contract," section 1717 now provides otherwise].)

Both parties agree section 1717 has been liberally construed by California courts. (See, e.g., *Milman v. Shukhat* (1994) 22 Cal.App.4th 538, 544 [legislative history of section 1717 requires liberal interpretation of phrase " 'on a contract' "]; *Dell Merk, Inc. v. Franzia* (2005) 132 Cal.App.4th 443, 455 [same].) "It is now settled that a party is entitled to attorney fees under section 1717 'even when the party prevails on grounds the contract is inapplicable, invalid, unenforceable or nonexistent, if the other party would have been entitled to attorney[] fees had it prevailed.' " (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 870.) "To achieve [section 1717's] goal, the statute generally must apply in favor of the party prevailing on a contract claim whenever that party would have been liable under the contract for attorney fees had the other party prevailed." (*Id.* at pp. 870–871.)

Tort claims or other noncontract claims may, or may not, trigger a contractual attorney fee provision depending on the wording of the provision. (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 602, 608.) "If a contractual attorney fee provision is phrased broadly enough, … it may support an award of attorney fees to the prevailing party in an action alleging both contract and tort claims: '[P]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract.' " (*Id.* at p. 608.)

Here, the fee provision was narrowly worded to apply only to attorney fees incurred in collecting amounts owed under the Contract. Although section 1717 operates to broaden the fee provision to apply to the entire Contract, it remains limited to contract claims and claims sounding in contract. (*Santisas v. Goodin*, *supra*, 17 Cal.4th at p. 615 [claim sounding in contract is an " 'action on a contract' within the meaning of section 1717"].) The fee provision, as worded and broadened by section 1717, cannot rationally be interpreted to extend to claims sounding in tort.

As some courts have acknowledged, " ' "[i]t is difficult to draw definitively from case law any general rule regarding what actions and causes of action will be deemed to be 'on a contract' for purposes of [section] 1717." ' " (*Douglas E. Barnhart, Inc. v. CMC*

*Fabricators, Inc.* (2012) 211 Cal. App. 4th 230, 241, citing *Hyduke's Valley Motors v. Lobel Financial Corp.* (2010) 189 Cal.App.4th 430, 435.)

> "The phrase 'action on a contract' includes not only a traditional action for damages for breach of a contract containing an attorney fees clause [citation], but also any other action that 'involves' a contract under which one of the parties would be entitled to recover attorney fees if it prevails in the action [citation]. 'In determining whether an action is "on the contract" under section 1717, the proper focus is not on the nature of the remedy, but on the basis of the cause of action.' " (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*, *supra*, 211 Cal.App.4th at pp. 240–241.)

Courts have determined that actions for rescission or cancellation of a contract may be considered actions "on a contract" for purposes of section 1717. (See, e.g., *Leaf v. Phil Rauch, Inc.* (1975) 47 Cal.App.3d 371, 378 [rescission of motor vehicle conditional sale contract]; *Hastings v. Matlock* (1985) 171 Cal.App.3d 826, 841 [rescission] (*Hastings*); *Star Pacific Investments, Inc. v. Oro Hills Ranch, Inc.* (1981) 121 Cal.App.3d 447, 463 [cancellation based on lack of consideration and intentional misrepresentation].)

Here, plaintiffs alleged the vehicle they purchased was subject to express warranties on the engine and transmission and the implied warranty of merchantability.[10] They alleged that the vehicle did not conform to the warranties provided, that Auto Cruz failed to fix the vehicle's mechanical defects, and that the vehicle stopped running and became inoperable. They further allege that Auto Cruz violated the CLRA by, among other things, misrepresenting the vehicle's condition, selling a vehicle that was not merchantable, and refusing and failing to repair the vehicle as warranted. They allege Auto Cruz violated Song-Beverly by breaching the express warranty on the vehicle and the implied warranty of merchantability.

---

[10] "Unless excluded or modified ([U. Comm. Code,] § 2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." (U. Comm. Code, § 2314.)

Claims for breach of an express warranty are based on the parties' agreement and sound in contract. (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 117.) Conversely, "the implied warranty of merchantability arises by operation of law." (*Ibid*.) Courts have held that the breach of obligations implied at law in contract matters, and the breach of contractual obligations implied in fact, fall within the scope of section 1717. (*Hjelm v. Prometheus Real Estate Group, Inc.* (2016) 3 Cal.App.5th 1155, 1168–1160 [§ 1717 applicable to claim for breach of implied warranty of habitability]; *Schoolcraft v. Ross* (1978) 81 Cal.App.3d 75, 82 [§ 1717 applicable to claim for breach of implied covenant of good faith and fair dealing]; *A&M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 495 [§ 1717 applicable to claim for breach of implied warranty of fitness for particular purpose].) "The parties' 'total legal obligation' may be a composite of written terms, oral expression and responsibilities implied by law. All may be enforced by an 'action on [the] contract.' " (*A&M Produce Co. v. FMC Corp.*, at p. 495, fn. omitted.)

That plaintiffs styled their causes of action as violations of the CLRA and Song-Beverly does not alter the fact that the primary right at issue was contractual in nature. (See *Perry v. Robertson* (1988) 201 Cal.App.3d 333, 339–344 [drafting cause of action as "negligence" is not dispositive, and claim may still sound in contract thereby permitting application of § 1717].) Similarly, the fact the California Legislature has seen fit to provide consumers with additional remedies for certain contractual claims does not alter the nature of the action. Notably, the remedies provided under the CLRA and Song-Beverly are cumulative and are in addition to any remedies otherwise provided under the law. (§§ 1752, 1790.4.)

We conclude plaintiffs' first and fourth causes of action under the CLRA and Song-Beverly, respectively, sound in contract. Moreover, it is not unreasonable to suspect that, had Beneficial been successful in defending against these causes of action, it would have been entitled to an award of attorney fees against plaintiffs because it would

have vindicated its right to payment under the Contract.[11] The mutuality of remedy doctrine espoused in section 1717 requires that plaintiffs be afforded the same right to an award of attorney fees.

Our conclusion is different with respect to plaintiffs' causes of action for fraud and negligent misrepresentation. A cause of action for fraudulent inducement is not "on the contract" for purposes of section 1717. (*Schlocker v. Schlocker* (1976) 62 Cal.App.3d 921, 922–923, italics omitted.) "A tort action for fraud arising out of a contract is not, however, an action 'on a contract' within the meaning of [section 1717]." (*Stout v. Turney* (1978) 22 Cal.3d 718, 730.) "[A]n action for negligent misrepresentation is not an action to enforce the provisions of a contract." (*McKenzie v. Kaiser-Aetna* (1976) 55 Cal.App.3d 84, 89.)

Plaintiffs contend "when the plaintiff's claim seeks rescission based on fraud, the courts have concluded such claim does sound in contract and permits the award of fees under section 1717." In support of this contention, plaintiffs cite to *Super 7 Motel Associates v. Wang* (1993) 16 Cal.App.4th 541, 549 (*Super 7*), citing *Hastings*, *supra*, 171 Cal.App.3d at p. 841 and *In re: Mac-Go Corporation* (Bankr.N.D.Cal 2015) 541 B.R. 706, 715–716 (*Mac-Go*). These cases do not aid plaintiffs.

*Super 7* is relevant only to the extent it cites *Hastings*, *supra*, 171 Cal.App.3d at p. 841 for the legal principle asserted by plaintiffs. Otherwise, the case is inapposite in that the holding of the court was that the attorney fee claimant was not a party to the

---

[11] The California Supreme Court has noted that the provision in Song-Beverly that " 'costs and expenses, including attorney[] fees' " are to be awarded to a prevailing buyer (§ 1794, subd. (d)) is silent as to a prevailing seller and, thus, does not preclude a prevailing seller from obtaining an award of costs and expenses. (*Murillo v. Fleetwood Enterprises, Inc*. (1998) 17 Cal.4th 985, 991, 999.) By parity of reasoning, the same would hold true for an award of attorney fees. Moreover, a prevailing seller under the CLRA may recover fees if the consumer's action was not brought in good faith. (§ 1780, subd. (e); *Corbett v. Hayward Dodge, Inc.* (2004) 119 Cal.App.4th 915, 920.)

contract containing the attorney fee provision and, thus, any potential liability was not premised on the contract. (*Super 7*, *supra*, 16 Cal.App.4th at pp. 549–550.)

In *Hastings*, the fee provision stated " '[i]f any party to this agreement, … shall institute any legal action against any other party to this agreement, the prevailing party shall be entitled to court costs and reasonable attorney[] fees .…" (*Hastings*, *supra*, 171 Cal.App.3d at p. 831.) Because the contractual provision did "not limit recovery of such fees to any particular form of action involving the contract," the court allowed recovery of attorney fees. (*Id*. at 841.) Thus, it appears *Hastings* was predicated on the breadth of the attorney fee provision at issue. Here, the attorney fee provision is much narrower than in *Hastings*.

In *Mac-Go*, the court premised its holding on several facts distinguishable from the case at bar. *Mac-Go* involved adversary proceedings by a bankruptcy trustee to recover alleged preferential transfers made to a creditor bank (11 U.S.C.A § 547), and to avoid fraudulent transfers allegedly made to the bank in fraud of other creditors (*id*. at § 548). (*Mac-Go*, *supra*, 541 B.R. at pp. 715–717.) Unlike plaintiffs' claims, the alleged "fraud" at issue in *Mac-Go* was not fraud in the inducement of the relevant contracts. Moreover, in determining that section 1717 applied to the adversary proceedings, the court noted that several of the creditor bank's affirmative defenses were contractually based and were successfully relied upon by the bank. (*Mac-Go*, at p. 715.) The *Mac-Go* court held the contractual fee provisions at issue "were sufficiently broad to include the fees and costs that [the bank] incurred in defending against the Trustee's preference claim, since [the bank's] defense was premised on its 'enforcement' of [the underlying contracts]." (*Id*. at p. 716.) The facts of *Mac-Go* bear little, if any, similarity to present case.

We conclude plaintiffs are not entitled to an award of attorney fees in connection with plaintiffs' second and third causes of action for fraud and negligent

misrepresentation, respectively.[12]  We acknowledge that it may be difficult or impractical to segregate plaintiffs' attorney fees among the claims for which an attorney fee award is proper (i.e., the CLRA and Song-Beverly causes of action) and those for which such an award is not proper.  However, it is not for this court to make that determination.

## VI.    Section 2983.4

Plaintiffs admit they did not seek an award of attorney fees under section 2983.4 in their motion for attorney fees.  Citing *Ward v. Taggart* (1959) 51 Cal.2d 736, 742, plaintiffs contend this court should consider the argument they are entitled to a fee award under said section because "[n]ew, purely legal arguments based on undisputed facts may be raised for the first time on appeal."  In response, Beneficial contends the argument has been waived and "[e]ven if this final argument raises only legal questions," this court should not consider plaintiffs arguments because "[d]oing so would be unfair to the trial court which never had an opportunity to rule on the question."

" 'It is the general rule that a party to an action may not, for the first time on appeal, change the theory of the cause of action.  [Citations.]  There are exceptions but the general rule is especially true when the theory newly presented involves controverted question of fact or mixed questions of law and fact.  If a question of law only is presented on the facts appearing in the record the change in theory may be permitted. [Citation.]' [Citation.]" (*Retzloff v. Moulton Parkway Residents' Association, No. One* (2017) 14 Cal.App.5th 742, 747.)  However, an appellate court is not required to consider a new theory on appeal even if the issue is purely one of law.  (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767; *Hussey-Head v. World Savings & Loan Assn.* (2003) 111 Cal.App.4th 773, 783, fn. 7.)

---

[12] Plaintiffs do not contend on appeal that they are entitled to attorney fees in connection with their causes of action for violation of Vehicle Code section 11713 and Business and Professions Code section 17200.  Accordingly, we express no opinion in that regard.

Plaintiffs waived the argument that section 2983.4 entitles them to an award of attorney fees by failing to raise it below in its motion for attorney fees. Moreover, we note plaintiffs did not allege a cause of action under the *Automobile Sales Finance Act* (§ 2981 et seq.) of which section 2983.4 is a part. Given that this matter was resolved by settlement in reliance of the causes of action asserted, we believe it would be inappropriate to consider the argument for the first time on appeal.

## DISPOSITION

We reverse the trial court's denial of plaintiffs' motion for attorney fees and remand to the trial court for further proceedings consistent with this opinion. Plaintiffs are awarded their costs on appeal.


POOCHIGIAN, ACTING P. J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.